* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. All parties *Page 2 
are properly before the Industrial Commission and the Commission has jurisdiction over the parties and the subject matter.
2. An employment relationship existed between plaintiff and defendant-employer on November 18, 2004.
3. The workers' compensation carrier of defendant-employer potentially on the risk on this claim is Liberty Mutual Insurance Company.
4. Plaintiff's average weekly wage is $682.22, yielding a weekly compensation rate of $454.81.
5. Defendant-employer has provided, and plaintiff has received, both short-term disability (STD) and long-term disability (LTD) benefits from plans that are, and, continue to be, fully funded by defendant-employer. Plaintiff received STD benefits totaling $1,950.00. He received $13,354.22 in LTD benefits through December 18, 2005, and $1,507.88 per month thereafter. Defendants are entitled to a deduction of payments, pursuant to N.C. Gen. Stat. § 97-42, in the form of a dollar for dollar credit for these STD and LTD payments against any temporary total disability (TTD) benefits plaintiff may be awarded by the Industrial Commission.
6. For the purposes of this hearing, the parties agree that plaintiff is temporarily totally disabled.
7. The issues for determination are:
 a. Whether plaintiff has developed a compensable occupational disease to his left arm as the result of his employment with defendant-employer?
 b. If so, to what compensation is plaintiff entitled?
 * * * * * * * * * * * *Page 3 EXHIBITS 1. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: I.C. Forms
 b. Stipulated Exhibit #2: Interrogatories
 c. Stipulated Exhibit #3: Interrogatories
 d. Stipulated Exhibit #4: Employee's job search
 e. Stipulated Exhibit #5: GED form
 f. Stipulated Exhibit #6: Job description
 g. Stipulated Exhibit #7: Tax returns
 h. Stipulated Exhibit #8: Supplemental security income form
 i. Stipulated Exhibit #9: Personnel file
 j. Stipulated Exhibit #10: Medical records
 k. Stipulated Exhibit #11: DVD of job
 l. Stipulated Exhibit #12: Response to job duties questions
 m. Stipulated Exhibit #13: High school records
2. Subsequent to the hearing, the parties submitted an accident investigation report and plaintiff's completed Family and Medical Leave Act application, which are hereby incorporated into the record as a supplement to Stipulated Exhibit #9, plaintiff's personnel file.
 * * * * * * * * * * * RULINGS ON DEPOSITION OBJECTIONS
In defendants' appeal to the Full Commission, defendants renewed their objection to the form and foundation of the hypothetical question asked by plaintiff's counsel to Dr. Deshmukh regarding the causation of plaintiff's ulnar neuritis. The undersigned rule that the factual error in *Page 4 
the hypothetical effects the weight to be accorded to Dr. Deshmukh's opinion and does not rise to a level sufficient to strike the testimony.
 * * * * * * * * * * *
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 44 years old and had completed the 9th
grade. Plaintiff had taken some classes toward receiving a GED.
2. Plaintiff worked for defendant-employer as a press operator and press helper from 1984 through December 2004. From 2002 until the end of his employment in December 2004, plaintiff was employed as a press helper, which entailed loading paper into the machine, checking ink levels, and insuring proper printing, on a six color press, which also produced paper packaging materials.
3. As a press helper, plaintiff's job duties included taking a load of paper from the sheeter machine and loading it onto a skid. The sheets of paper measure approximately 28 inches by 40 inches. A one and one-half inch stack weighs approximately 23 pounds. Plaintiff grabbed a stack of paper between two and three inches thick, drew the stack of paper to his body by bringing his elbows into his ribcage with his arms in a flexed position, then ruffled the stack of paper in his hands to get some air between the sheets of paper. Plaintiff generally offloaded the paper from one pallet to another in this manner, ruffling each stack as he moved it. Once ruffled, the stack was placed onto the skid and then positioned into the press.
4. The skids were loaded up to eye level (approximately 55 inches) and moved into the automated pre-loading area, from where the machine's feeder grabbed individual sheets of *Page 5 
paper for printing in the press. Occasionally (approximately twenty times during an eight hour shift), the stack of paper on the skid was either too high or too low to be pushed into the pre-loading area, and, then, the press helper manually unloaded or loaded paper onto the skid, usually between eight and twelve inches of paper. Plaintiff prepared approximately 20 to 30 skids for printing in an eight-hour shift.
5. Within the past ten years, defendant-employer purchased a "jogger aerator" to square the stacks of paper and put air between the sheets. Plaintiff testified that he did not use the machine, but continued to manually aerate the stacks of paper in the manner described above.
6. Plaintiff began to experience intermittent left elbow pain on or about November 18, 2004, that would last for one or two days before subsiding. Plaintiff attributed the pain to the repetitive activity of his job.
7. On November 30, 2004, plaintiff presented to Dale Patterson, a physician's assistant, at Mt. Gilead Medical Services, with complaints of pain and weakness when extending his left hand, especially in his fourth and fifth fingers. Mr. Patterson diagnosed plaintiff with possible carpal tunnel syndrome, provided plaintiff with a splint and referred him to Dr. Harrison Latimer for further evaluation.
8. Plaintiff presented to Dr. Harrison Latimer on December 6, 2004, with complaints of tingling in his left hand and some weakness in his grip. Dr. Latimer diagnosed plaintiff with ulnar nerve neuritis and referred plaintiff to a neurologist for a nerve conduction study. Plaintiff gave Dr. Latimer a work history of manual labor loading a paper press, but did not describe the specific job duties to Dr. Latimer. Plaintiff expressed a desire to continue working, and Dr. Latimer opined that he could with continued use of the brace. *Page 6 
9. On December 17, 2004, plaintiff presented to Dr. David Schmidt of Stanly Neurology. Dr. Schmidt performed nerve conduction tests, which showed evidence of a drop in the amplitude of the wave, suggesting injury to the ulnar nerve itself. The injury was located two centimeters above the left ulnar groove. Dr. Schmidt also performed an ulnar cubital tunnel test that corroborated the diagnosis of injury. Dr. Schmidt opined that plaintiff suffered a "severe axonal and demyelinating injury of the ulnar nerve two centimeters proximal to the left olecranon groove." Dr. Schmidt wrote plaintiff out of work and recommended an MRI.
10. Based upon the description of plaintiff's job consistent with that described above, Dr. Schmidt opined that prolonged and repetitive elbow flexion "certainly can explain the findings that we saw and would explain why [plaintiff] did so well with neurosurgery." Dr. Schmidt further opined that plaintiff's job placed him at an increased risk of developing neuropathy consistent with plaintiff's condition.
11. The MRI was conducted on December 21, 2004, and according to radiologist Dr. Peter Gusmer, showed, "no ulnar nerve subluxation or compression on the ulnar nerve with the elbow in extension."
12. Plaintiff returned to see Dr. Latimer on December 22, 2004, to discuss his treatment options. Dr. Latimer acknowledged that the MRI had been read as normal, but noted that the demyelinating injury revealed by the nerve conduction study was in a "strange location," and that plaintiff's continued sensory deficit warranted a neurosurgical evaluation. Dr. Latimer also wrote plaintiff out of work beginning on December 17, 2004 and continuing until further notice; however, the out of work note stated, "per Dr. Latimer, he doesn't feel repetitive work is related to . . . [patient's] condition." Dr. Latimer later testified that his opinion was based upon "my limited knowledge of [plaintiff's] work activities." *Page 7 
13. On January 5, 2005, plaintiff presented to Dr. Vinay Deshmukh of Carolina Neurosurgery and Spine with complaints in his left elbow going down into the hand with numbness and tingling in the last two fingers of the hand. Dr. Deshmukh noted that the MRI was normal, but that the nerve conduction study showed, "significant ulnar nerve compression at the elbow," and stated that plaintiff was "a good candidate for surgery."
14. Dr. Deshmukh performed left ulnar decompression on January 12, 2005, at Northeast Medical Center. On March 3, 2005, plaintiff was released by Dr. Deshmukh with instructions to "refrain from heavy lifting and repetitive hand movements due to ulnar nerve neuropathy." Based upon the restrictions, Dr. Deshmukh opined that plaintiff could not "return to his previous line of work because of the heavy lifting and repetitive movements," which he explained could place plaintiff at an increased risk for developing recurrent symptoms.
15. Plaintiff's counsel posed a hypothetical question to Dr. Deshmukh consistent with the above description of plaintiff's job duties, with the exception of the statement that plaintiff had been performing the job for 31 years rather than approximately 20 years as the evidence shows. Based upon the hypothetical, Dr. Deshmukh opined that plaintiff's job placed him at an increased risk over that of the general public of developing cubital tunnel syndrome or an ulnar neuropathy. Dr. Deshmukh further opined that the repetitive movements of flexion, extension, supination and pronation "worsened his syndrome."
16. The opinions of Dr. Deshmukh were based upon the repetitive movements required by plaintiff's position with defendant-employer, and do not appear to the undersigned to be specifically reliant upon plaintiff performing the activities for 31 years versus 20 years. Therefore, the undersigned gives significant weight to the opinions of Dr. Deshmukh and Dr. *Page 8 
Schmidt over the opinion of Dr. Latimer regarding the causal connection between plaintiff's condition and his work duties.
17. On or about November 18, 2004, plaintiff developed ulnar neuropathy and cubital tunnel syndrome as a result of his work-related duties that rendered him temporarily totally disabled beginning December 17, 2004.
18. On December 17, 2004, plaintiff was put on FMLA leave. He was terminated from his employment with defendant-employer on March 28, 2005. Plaintiff has received short and long-term disability benefits provided by an employer funded program. Plaintiff has received $1,950.00 in short-term disability benefits and $13,354.22 in long-term disability benefits through December 18, 2005. Plaintiff continues to receive $1,507.88 per month in long-term disability benefits.
19. Plaintiff's average weekly wage is $682.22, yielding a weekly compensation rate of $454.81.
 * * * * * * * * * * *
The foregoing findings of fact and conclusions of law engender the following:
 CONCLUSIONS OF LAW
1. In order for plaintiff to prevail in a claim for benefits based upon an occupational disease, he must show (1) that the condition is characteristic of persons engaged in the particular trade or occupation in which plaintiff is engaged; (2) the condition is not an ordinary disease of life to which the public generally is equally exposed; and (3) that there is a causal connection between the disease and plaintiff's occupation. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff has, by the greater weight of the expert medical testimony, presented sufficient evidence to show that his condition is the result of his occupational duties for *Page 9 
defendant-employer and that his occupation placed him at an increased risk over that of the general public of developing his condition.Id.
3. On or about November 18, 2004, plaintiff developed ulnar neuropathy and cubital tunnel syndrome as a result of his work-related duties. As a result of his condition, plaintiff has been temporarily totally disabled beginning December 17, 2004, and continuing. N.C. Gen. Stat. § 97-2(6).
4. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $454.81 per week for the period beginning on December 17, 2004 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. § 97-2(19).
6. Defendants are entitled to a credit for short and long term disability benefits paid to plaintiff from December 17, 2004 through the date of this Opinion and Award.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 A W A R D
1. Subject to a reasonable attorney's fee herein approved and a credit due defendants, defendants shall pay temporary total disability compensation to plaintiff at the rate of $454.81 per week for the period beginning on December 17, 2004 and continuing. As much of *Page 10 
said compensation as has accrued shall be paid in a lump sum, subject to a credit due to defendants.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from the lump sum due plaintiff and paid directly to counsel. Thereafter, every fourth payment shall be made directly to plaintiff's counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendants shall take a credit from the lump sum payment approved for plaintiff in Paragraph 1 above, in an amount equal to short and long-term disability benefits paid to plaintiff from December 17, 2004 through the date of this Opinion.
5. Defendants shall pay the costs.
This the 21st day of March 2007
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ LAURA K. MAVRETIC COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT *Page 11 
 COMMISSIONER *Page 1